Ruffin, C. J.
 

 The deed of emancipation, stated in the case agreed, is in these words : “To all whom it may concern : Know ye, that I, John Moring, of &c. do by these presents emancipate and set at full liberty from myself, my heirs, and all persons claiming under me, a certain parcel of negroes as they come to the age and time hereinafter to be mentioned: Hannah, Patrick, Cherry, Jordan and Charlotte, to be free without day — Isabel to be free from the 1st day of November, 1807;
 
 Polly to be free the
 
 1st
 
 day of
 
 April, 1814; Burwell to be free the 10th day of April, 1822, &c.” Before the 1st of April, 1814,
 
 Polly
 
 had issue in this State, a female child, who was the mother of the present plaintiff The question in the case is, whether the plaintiff’s mother was upon her birth free, or became so before the birth of the plaintiff; for it is admitted by his counsel, that the plaintiff’s condition is necessarily
 
 to
 
 be determined by that of his mother at his-birth.
 

 There is a natural inclination in the bosom of every judge to favor the side of freedom, and a strong sympathy with the plaintiff, and the other persons situated as he is, who have been allowed to think themselves free and act for so long a time as if they were ; and, if we were permitted to decide this controversy according to our feelings, we should with promptness and pleasure pronounce our judgment for the plaintiff.' But the court is to be governed by a different rule, the impartial and unyielding rule of the law ; and, after giving to the case an anxious and deliberate consideration, we fincT ourselves obliged to hold, that in law the condition of the plaintiff is that of slavery.
 

 By the statute law of Yirginia, the owners of slaves could
 
 *227
 
 emancipate them by will or deed ; and, therefore, our enqui-ry here only is, as to the nature and extent of the pation granted to the plaintiff’s grand-mother,
 
 Polly.
 
 In our own law, while emancipation was permitted, there could not be an emancipation to take effect
 
 in futuro; fox
 
 as it was by the license of a court, to be granted only for adjudged meritorious services, it could not relate back beyond that judgment, and moreover was necessarily immediate.—
 
 Bryan
 
 v Wadsworth, 1 Dev. & Bat. 384. But as there was in Virginia, after the year 1782, no such restriction upon the power of the owner to renounce his dominion over his slave, it would seem, also, necessarily to follow, that the owner might use his pleasure in prescribing the conditions on which, and the time when, the liberation should go into operation. Accordingly there have been, numerous adjudications in that State, that the owner may emancipate
 
 in fu-turo
 
 ; as if by will he bequeaths a slave to ohe for life and then to be emancipated, or if by deed he emancipates at any certain day to come, or after his own death.
 
 Pleasants
 
 v
 
 Pleasants, 2
 
 Call Rep. 319.
 
 Maria
 
 v
 
 Surbaugh,
 
 2 Rand. 228.
 
 Isaac
 
 v
 
 West,
 
 6 Rand. 652. The principle, indeed, seems to be settled law in all those States, where liberation by the act of the owner simply is tolerated. Admitting then that this deed of emancipation is not void, because it did not grant immediate and unqualified freedom, and that upon the arrival of the period mentioned, the 1st day of April, 1814, Polly would then be absolutely free, a question arises, what in the intermediate period is her state — that of freedom in some form and to some extent, or of continued slavery — and what is the state of her issue born within that period ? As was said by the Supreme Court' of the United States, in
 
 McCutchen
 
 v Marshall, 8 Peters, 220, “if this were an open question, it might be urged with some force, that the condition of the person” (to be emancipated at a subsequent time,)
 
 “
 
 was not that of absolute slavery, but was converted into a modified servitude, to end at the day or upon the event specified in the will or deed; and that the children of a female in that situation would stand in the same condition and
 
 *228
 
 be entitled to freedom as the mother was.” But it is admitted that ease, that the decisions in the States, where slavery exists, go very strongly, if not conclusively, to establish the principle, that persons thus situated are slaves, that the manumission is only conditional, and that, until the contingency happens, upon whieh the freedom is to take effect, they remain to all intents and purposes absolute slaves. And, upon that principie, that court held in the case cited, that the children, born before the day when the mother became free by the limitations of the will, were slaves. The court considered the principle so well settled that it could not be disturbed. Our researches, aided by those of the counsel in this pase, lead us to the same conclusion.
 

 The enquiries, what was the condition of the mother and what of the issue, up to the day when the liberation became absolute, arose in the case of
 
 Maria
 
 v
 
 Surbaugh,
 
 which has been already mentioned; and, upon the unanimous opinion of the judges, that of the mother was held to be that of temporary slavery and not of mere servitude, and that of the issu.e to be that of perpetual slavery. The questions were fully considered and elaborately discussed, and particularly by Judge Green, whose able and learned opinion will be generally looked to, as the leading and most authoritative one upon this point of American jurisprudence. He examined the subject thoroughly at common law, as regulated by the civil law, and as modified by the legislation of his own State; and proves very satisfactorily to our apprehension, that the emancipation does not presently enure to the slave, when the instrument made by the owner postpones it. The consequence, thatthe issue, born of a female while in that state of slavery and with the prospect of emancipation before her, must be slaves, results conclusively from the maxim,
 
 partus sequitur
 
 ventrón; which, we believe, has been universally adopted in this country; But the decision depends upon the law of the State, where the act of emancipation was executed, under which the plaintiff claims.— As that occurred in Yirginia, it would suffice, that by the law of that State; as declared in her statutes and expounded by
 
 *229
 

 her courts,
 
 the
 
 plaintiff’s
 
 mother is deemed a slave, because born before her mother became free. But it is the more isfactojy
 
 to
 
 find, that in deciding the case in conformity to the law of Virginia, we are not proceeding upon a rule peculiar to the law of that State, butjjone which has been declared to be a part of the law of nearly all the States in the Union, in which the question could arise, and which pervaded also that code, which was at one time the law of nearly all the civilized world, the civil law of Rome, in the dominions of which nation the class of slaves was more numerous than it has ever been in almost all other countries. In 1809, it was held in Kentucky, that if a slave be entitled to freedom at a future day, her issue bom before the day are slaves.
 
 Frank
 
 v
 
 Shannon,
 
 1 Bibb 615. The doctrine was laid down a second time in the same State in 1811.
 
 Ned
 
 v
 
 Beale,
 
 2 Bibb, 298. In Maryland there was a similar decision in 1825,
 
 Chew
 
 v
 
 Gary,
 
 6 Harr. & John. 526, and in the previous case of
 
 Hughs
 
 v Milly, 5 Harr. & John. 310. And in
 
 Catin
 
 v
 
 D’Orgenoy’s heirs,
 
 8 Martin’s Louisiana Rep. 218, where an owner had by deed emancipated a female slave “ with the qualification and condition that she shall hold and enjoy freedom immediately after my death, but during my life she is to remain in my service and power as she has done to the date of these presents,” it was held in 1820, that until the death of the owner, the woman was of that class of persons known to the Roman law as
 
 statu li-beri,
 
 and that her children, born while she was in that state, were not entitled to be free. And finally followed in 1834, the case of
 
 McCutchen
 
 v
 
 Marshall,
 
 8 Peters, 220, in which the Supreme Court, with inclinations to the contrary, acknowledged, that, by the adjudications of the States tolerating slavery, the principle had been conclusively established. We have found, and indeed have heard of no opposing adjudication, nor of any opinion to the contrary, but that of the learned judge, who gave the judgment in
 
 Harris
 
 v
 
 Clarissa,
 
 6 Yerger’s Rep. 227. The decision in that case was undoubtedly correct; for, as might be collected from his directing that not only all the grown negroes, but also “all
 
 *230
 
 the
 
 yoang
 
 negroes which I may have” should have their free-dom, the inteution of the testator was to set the issue as well as the original stock free ; and that intention is of course as efficacious in respect to the issue as it is in respect to the parents.
 
 Pleasants
 
 v
 
 Pleasants,
 
 2 Call Rep. 319.
 
 Hamilton
 
 v
 
 Cragg,
 
 6 Harris & John. 16.
 
 Fanny v Bryant,
 
 4 J. J. Marshall’s Rep. 368. This court held the same thing upon the language of the will in
 
 Campbell
 
 v
 
 Street,
 
 1 Ired. Rep. 109. It is admitted, however, that in
 
 Harris
 
 v
 
 Clarissa,
 
 a dissatisfaction was expressed with the principles of the adjudications here adduced, as being in prejudice of human liberty, and the opposite principle was asserted, that an emancipation at a day to come creates a present right to freedom, though there may be an obligation of service until that time ; and, as an inference, it was declared that the issue in the meantime was free by birth-right derived from the mother. We have said that we do not find this opinion concurred in elsewhere; and therefore, we do not feel at liberty to be governed by it, in opposition to the many respectable adjudications before quoted.
 

 It has, however, been urged that the instrument of emancipation in the case before us is a deed ; and that, from the nature of that instrument, and from the words of present grant in this one, “do by these presents emancipate and set at full liberty,” the liberation of Polly and all the other slaves mentioned in the deed, was immediate. And, in support of this position, another case from Virginia,
 
 Isaac
 
 v
 
 West’s Ex’ors,
 
 6 Rand. Rep. 652, was particularly relied on. We do not thing that much can be built on the difference between the operation of a will, and a deed ; for, as a slave, the person is incapable of taking under either, as a grantee. The slave is not conveyed or bequeathed to himself. It is, in truth, nothing more than the renunciation by the owner of his right of property or dominion in or over the slave, rendered effectual by the law, when done with certain ceremonies ; and, it would be doing violence to the cause of humanity towards the unfortunate slaves themselves, as well as to the intentions of the emancipator, if the same intention, expressed in the- same language in those two instru-
 
 *231
 
 merits, were in the one case to be observed and in the other defeated. We conceive that the true rule is, to carry the real purpose of the party so far as it can be collected, in whatever form it may be couched ; and that when the intention is doubtful, whether the intsrument be a deed or a will, there is to be a leaning and liberal construction in favor of liberty, as far as it is allowed by law to be conferred. These views are not opposed by the case of
 
 Isaac
 
 v
 
 West's Ex'ors.
 
 The deed in that case began with these words, “I, A. W. do by these presents manumit and set free the following negroes at my death.” Upon that clause, standing alone, the court said “it was clear the negroes would have continued slaves to all intents and purposes until West’s death.” But the deed had these other clauses : “ They shall serve me as long as I live ; and I do hereby relinquish all my right and title in and unto the aforesaid negroes, Josiah, Joshua, &c.” Upon these last clauses, by themselves, the court said the slaves would have been immediately free. The construction was therefore necessarily doubtful; and the court said, that in such a case weight was to be given, not merely to the technical maxim of the common law, that a deed is to be taken most strongly against the grantor, but to the enlarged spirit of the laws of all civilized nations, which favors liberty.
 
 In obscura vo-lúntate, manumittentis favendnm est liberlati.
 
 It is thus the purpose and intention, voluntas, of the manumitter, whether contained in one species of legal instrument or another, that governs ; and when that is obscure, we presume most favorably for his charity and the liberty of the captive. The case relied on is thus seen to be really an authority against the plaintiff; for if. is expressly said, that, notwithstanding the words in the present tense “do by these presents manumit and set free,” the negroes would be slaves until West’s death, by force of the words “at my death.”__ That is precisely our case. These negroes are set free “ as they come to the ages and time hereinafter mentioned.”_ There is no other clause in the instrument to come in conflict with this, or to obscure the purpose. The intention here cannot be mistaken ; for the deed proceeds then to say,
 
 *232
 
 that certain of the negroes should be “ free withot day,” that without any day to come, immediately; and that the others should become free respectively on certain days to come, as therein specified. Thus the conditions of the different negroes are plainly and expressly distinguished from each other, as to their being or not being immediately free, and we cannot take it on ourselves to frustrate that positive condition of the emancipation, by saying, that they were free before the days given them by their owner. Moreover, it is to be noticed, that the case of
 
 Catin v D’Orgenoy's heirs,
 
 8 Mar. Louis. Rep. 218, arose upon a deed, of which the material words have been already quoted; and the case of
 
 Frank v Shannon,
 
 1 Bibb 615, arose upon an act
 
 inter vi-vos,
 
 a registration in Pennsylvania, under her act for the gradual abolition of slavery ; and in each case it was held that, until the period of actual emancipation arrived, the state of slavery continued, and that the issue of the females were slaves absolutely.
 

 The court cannot, therefore, escape from the conclusion, that the plaintiff’s mother was born a slave, and so, consequently, was he. With this conviction it becomes our duty to affirm the judgment; consoling ourselves that the sentence is not ours but that of the law, whose ministers only we are.
 

 Per Curiam. Judgment affirmed.